Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID NGUYEN, Derivatively and on Behalf of NEVRO CORP.,

      Plaintiff,

      vs.

RAMI ELGHANDOUR, ANDREW GALLIGAN, MICHAEL DEMANE, ALI BEHBAHANI, LISA EARNHARDT, FRANK FISCHER, WILFRED E. JAEGER, SHAWN T. MCCORMICK and BRAD VALE,

      Defendants,

      and

NEVRO CORP.,

      Nominal Defendant.

Case No.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.      Plaintiff David Nguyen ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Nevro Corp. ("Nevro" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Rami Elghandour, Andrew Galligan, Michael DeMane, Ali Behbahani, Lisa Earnhardt, Frank Fischer, Wilfred E. Jaeger, Shawn T. McCormick, and Brad Vale (collectively, the "Individual Defendants," and together with Nevro, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Nevro, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 14a-9 promulgated thereunder.

2.      The allegations in this Complaint are made upon Plaintiff's personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nevro, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

3.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by certain of Nevro's directors and officers from January 8, 2016 through the present.

4.      Founded in 2006, Nevro develops and commercializes products for the management of chronic pain. The Company's products include its spinal cord stimulation systems ("SCS"), Senza I and Senza II (the "Senza Systems"). The Individual Defendants caused the Company to promote its Senza Systems, and the Company's HF10 therapy delivered by the Senza Systems, as proprietary throughout the

time the misconduct occurred, and, in at least one instance during the time the misconduct occurred, as novel.

5.     Nevro has been involved in a number of disputes over intellectual property rights with Boston Scientific Corp. (together with its subsidiaries, "Boston Scientific") since at least 2016.   On November 28, 2016, Nevro filed a patent infringement action against Boston Scientific and Boston Scientific Neuromodulation Corp. in this District, asserting that those defendants were infringing on Nevro's patents relating to its Senza Systems and HF10 therapy (the "Nevro Action").[1] On December 9, 2016, Boston Scientific filed a patent infringement lawsuit against Nevro in the United States District Court for the District of Delaware alleging that the Senza Systems infringe Boston Scientific patents related to stimulation leads, batteries, and telemetry units.[2]

6.     On April 27, 2018, Boston Scientific Corp. and Boston Scientific Neuromodulation Corp. filed suit against the Company in the United States District Court for the District of Delaware, alleging patent infringement, theft of trade secrets, and tortious interference with contract (the "Boston Scientific Action").[3] Boston Scientific's claims for patent infringement related to U.S. Patent Nos. 6,609,032, 7,177,690, 8,781,596, and 8,918,174.

7.     The Boston Scientific Action further alleged that Nevro had engaged in a scheme, beginning no later than 2009, to hire no less than 48 former employees of Boston Scientific to obtain trade secrets of Boston Scientific in order to develop the Senza Systems.

8.     On this news, the Company's share price fell $1.46, or 1.6%, from its closing price on April 27, 2018, closing at $89.36 per share on April 30, 2018, the following trading day.

---

[1] *Nevro Corp. v. Boston Scientific Corp. and Boston Scientific Neuromodulation Corp.*, No. 3:16-cv-06830-VC (N.D. Cal. Nov. 28, 2016).
[2] *Boston Scientific Corp. and Boston Scientific Neuromodulation Corp. v. Nevro Corp.*, No. 1:16-cv-01163-CFC (D. Del. Dec. 9, 2016).
[3] *Boston Scientific Corp. and Boston Scientific Neuromodulation Corp. v. Nevro Corp.*, No. 1:18-cv-00644-CFC (D. Del. Apr. 27, 2018).

Verified Shareholder Derivative Complaint

9.     On May 7, 2018, the Company issued a press release and held a conference call with analysts and investors, both of which provided the Company's financial and operating results for the quarter ended March 31, 2018. The reported financial results were below analyst's estimates. The Company attributed this to an increase in operating expenses, including litigation costs associated with the ongoing patent litigation.

10.    On this news, the Company's share price fell $14.67, or 15.9%, from its closing price on May 7, 2018, closing at $77.59 per share on May 8, 2018.

11.    On July 2, 2018 Morgan Stanley & Co. ("Morgan Stanley") analysts downgraded Nevro's rating to "Equal Weight", citing the "key risk" associated with intellectual property litigation facing the Company, and questioning the Company's claims to clinical superiority.

12.    On this news, the Company's share price fell $6.62, or 8.3%, from its closing price on June 29, 2018, the previous trading day, closing at $73.23 per share on July 2, 2018.

13.    On July 10, 2018, several analysts issued reports on a tentative ruling in the Nevro Action issued by the Honorable Judge Vince Chhabria of this District on July 5, 2018. The tentative ruling invalidated five of Nevro's patents related to its HF10 therapy and Senza systems, thereby threatening to end Nevro's case against Boston Scientific. Analysts' reports downgraded Nevro's ratings based on the tentative ruling.

14.    On this news, the Company's share price fell $11.43, or 15.1%, from its closing price on July 9, 2018, closing at $64.04 per share on July 10, 2018.

15.    Before markets opened on July 13, 2018, the Company abruptly filed a Form 8-K with the SEC announcing that it had "determined to terminate James Alecxih's, Vice President Worldwide Sales, employment with the Company."

16.    On this news, the Company's share price fell $10.27, or 15.1%, from its closing price on July 12, 2018, closing at $10.27 per share on July 13, 2018.

17.     During the time the misconduct occurred, the Individual Defendants breached their fiduciary duties by causing the Company to obtain confidential, proprietary, and/or trade secret information from its competitors, including through documents stolen from Boston Scientific, in order to develop and improve Nevro's Senza Systems and HF10 therapy. In furtherance of this scheme, the Individual Defendants caused the Company to hire former employees of Boston Scientific involved in the development of Boston Scientific's SCS technology, and caused those former Boston Scientific employees to divulge confidential information from Boston Scientific, in violation of those employee's non-disclosure agreements with Boston Scientific and Nevro's Code of Conduct and Ethics (the "Trade Secrets Misconduct").

18.     As a result of the Trade Secrets Misconduct, the Company has been, and will continue to be, exposed to litigation costs in the millions, and the Company's ability to continue marketing its products as they are currently designed and approved is uncertain.

19.     During the time the misconduct occurred, the Company and the Individual Defendants intentionally or recklessly made materially false and misleading statements and failed to disclose material facts regarding the Company's business and operations. Specifically, the Individual Defendants made and caused the Company to fail to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions, as well as increased litigation expenses; (4) due to the Trade Secrets Misconduct, the Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

20.     The Company's public statements during the time the misconduct occurred caused Nevro's stock price to be artificially inflated.

21.     The Individual Defendants further breached their fiduciary duties by failing to maintain internal controls and permitting, facilitating, and causing the Company to make false and misleading statements and omissions of material fact, and to fail to correct these false and misleading statements and omissions of material fact.

22.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, as well as its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to being named as defendants in a securities class action pending in this District (the "Securities Class Action"). The Individual Defendants' misconduct, which has also forced the Company to undertake internal investigations, implement adequate internal controls, and resulted in losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, has and will cost the Company many millions of dollars.

23.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, eight of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the Company's CEO's and CFO's liability in the Securities Class Action and the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of the Nevro Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule

14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

29.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of Nevro. Plaintiff has held Nevro common stock since before all of the false and misleading statements that are alleged herein were made.

### Nominal Defendant Nevro

31.     Nevro is a Delaware corporation with its principal executive offices at 1800 Bridge Parkway, Redwood City, CA 94065. Nevro's common stock trades on the NYSE under the ticker symbol "NVRO."

**Defendant Elghandour**

32.     Defendant Rami Elghandour ("Elghandour") has served as a Company Director since May 2016 and as the Company's President and CEO since June 2016. According to the Company's Schedule 14A filed with the SEC on April 6, 2018 (the "2018 Proxy Statement"), as of March 28, 2018, Defendant Elghandour beneficially owned 462,657 shares of the Company's common stock, representing 1.5% of all outstanding common stock as of that date.[4] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Elghandour owned approximately $39.9 million worth of Nevro stock.

33.     For the fiscal year ended December 31, 2017, Defendant Elghandour received $13,224,189 in compensation from the Company. This included $680,000 in salary, $5,041,130 in stock awards, $6,449,703 in option awards, $1,048,356 in non-equity incentive plan compensation, and $5,000 in all other compensation.

34.     The Company's 2018 Proxy Statement stated the following about Defendant Elghandour:

> ***Rami Elghandour***[5] joined us in October 2012, and has served as our Chief Business Officer and currently serves as our President and Chief Executive Officer. From September 2008 to October 2012, Mr. Elghandour managed investments for Johnson & Johnson Development Corporation, or JJDC, where he led several investments and served on the board of directors of a number of private companies, including our board of directors. Additionally, he led strategic initiatives in the development and management of JJDC's portfolio. From 2001 to 2006, Mr. Elghandour worked for Advanced Neuromodulation Systems, Inc. (acquired by St. Jude Medical), a medical device company, where he led firmware design and development on several implantable neurostimulators. Mr. Elghandour received an M.B.A. from the Wharton School of the University of Pennsylvania and a B.S. in Electrical and Computer Engineering from Rutgers University School of Engineering. We believe that Mr. Elghandour is qualified to serve on our Board due to his investment and engineering experience, strategic track record, and his service as our President and Chief Executive Officer.

35.     Upon information and belief, Defendant Elghandour is a citizen of the State of California.

---

[4] Consists of 12,842 shares held by Defendant Elghandour and 449,815 shares that may be acquired pursuant to the exercise of stock options or the delivery of shares underlying restricted stock units ("RSUs") that will vest within 60 days of March 28, 2018.

[5] Emphasis in original unless otherwise noted throughout.

**Defendant Galligan**

36.     Defendant Andrew Galligan ("Galligan") has served as the Company's CFO since 2010. According to the Company's 2018 Proxy Statement, as of March 28, 2018, Defendant Galligan beneficially owned 171,360 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Galligan owned approximately $14.8 million worth of Nevro stock.

37.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Galligan made the following sales of the Company's stock, and made no purchases of Company stock:

| Date | Number of Shares | Price[7] | Proceeds |
|------|------------------|----------|----------|
| March 1, 2018 | 7,000 | $79.39-81.21 | $   560,711 |
| May 14, 2018 | 7,000 | $75.85-76.64 | $   532,959 |

Thus, in total, before the fraud was exposed, he sold 14,000 shares of the Company's stock on inside information, for which he received approximately $1.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

38.     For the fiscal year ended December 31, 2017, Defendant Galligan received $2,722,503 in compensation from the Company. This included $430,000 in salary, $998,530 in stock awards, $858,068 in option awards, $430,905 in non-equity incentive plan compensation, and $5,000 in all other compensation.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Galligan:

---

[6] Consists of 10,067 shares held by Defendant Galligan and 161,293 shares that may be acquired pursuant to the exercise of stock options within 60 days of March 28, 2018.

[7] Price ranges in this column represent the range of prices at which Defendant Galligan sold stock on the date in question. Proceeds have been calculated using the weighted average sale price listed in the relevant Form 4's filed with the SEC.

*Andrew H. Galligan* has served as our Chief Financial Officer since May 2010. From February 2009 to July 2010, Mr. Galligan served as Vice President of Finance and Chief Financial Officer at Ooma, a consumer electronics manufacturer and VOIP service provider. From 2007 to 2008, Mr. Galligan served as Vice President of Finance and CFO of Reliant Technologies, Inc. (later acquired by Solta Medical, Inc.), a medical device company. Mr. Galligan has also held the top financial executive position at several other medical device companies and began his career in various financial positions at KPMG and Raychem Corp. Mr. Galligan has served on the board of directors at OOMA, a publicly held consumer telecommunications company, since December 2014. Mr. Galligan also served on the board of directors of DiaDexus, Inc., a public medical diagnostics company, until January 2015. Mr. Galligan received a degree in Business Studies from Trinity College in Dublin, Ireland and is also a Fellow of the Institute of Chartered Accountants in Ireland.

40.     Upon information and belief, Defendant Galligan is a citizen of the State of California.

**Defendant DeMane**

41.     Defendant Michael DeMane ("DeMane") has served as a Company Director since 2011, and has served as the Company's non-executive Chairman of the Board since January 2017. Defendant DeMane previously served as the Company's CEO and Executive Chairman from March 2011 to January 2017. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant DeMane beneficially owned 674,994 shares of the Company's common stock, representing 2.3% of the Company's outstanding shares as of that date.[8] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, DeMane owned approximately $58.2 million worth of Nevro stock.

42.     For the fiscal year ended December 31, 2017, Defendant DeMane received $329,903 in compensation from the Company. This included $105,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

43.     The Company's 2018 Proxy Statement stated the following about Defendant DeMane:

---

[8] Consists of 467,367 shares held by Defendant DeMane, 42,554 shares held by Catherine Q. DeMane Trustee, Michael F. DeMane 2012 Irrevocable Trust U/A/D July 26, 2012, 50,000 shares held by Michael DeMane Trustee, Michael F. DeMane 2016 Retailed Annuity Trust U/A/D May 22, 2017 and 115,073 shares that may be acquired pursuant to the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018.

*Michael DeMane* joined us in March 2011 and has served as our Chief Executive Officer and as Executive Chairman. Effective January 1, 2017, Mr. DeMane transitioned to non-executive Chairman of the Board. Mr. DeMane has served on the board of directors of several private companies since 2009, as well as on the board of directors of eResearch Technology, Inc., a public company specializing in contract research clinical services, from July 2008 to April 2012. From March 2009 to June 2010, Mr. DeMane served as a Senior Advisor to Thomas, McNerney & Partners, a healthcare venture firm. Mr. DeMane served as the Chief Operating Officer of Medtronic, Inc. from August 2007 to April 2008. Prior to his COO role, Mr. DeMane served at Medtronic Inc. as Senior Vice President from May 2007 to August 2007, Senior Vice President and President: Europe, Canada, Latin America and Emerging Markets from August 2005 to May 2007, Senior Vice President and President: Spinal, ENT and Navigation from February 2002 to August 2005, and President, Spinal from January 2000 to February 2002. Prior to that, he was President at Interbody Technologies, a division of Medtronic Sofamor Danek, Inc., from June 1998 to December 1999. From April 1996 to June 1998, Mr. DeMane served at Nephew Pty. Ltd. as Managing Director, Australia and New Zealand, after a series of research and development and general management positions with Smith & Nephew Inc. Mr. DeMane earned a B.S. in Chemistry from St. Lawrence University and an M.S. in Bioengineering from Clemson University. We believe that Mr. DeMane is qualified to serve on our Board due to his investment experience, strategic leadership track record, service on other boards of directors of companies in the healthcare industry and his service as our Chief Executive Officer.

44.     Upon information and belief, Defendant DeMane is a citizen of the State of California.

**Defendant Behbahani**

45.     Defendant Dr. Ali Behbahani ("Behbahani") has served as a Company Director since 2014. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant Behbahani beneficially owned 21,049 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Behbahani owned over $1.8 million worth of Nevro stock.

46.     For the fiscal year ended December 31, 2017, Defendant Behbahani received $293,903 in compensation from the Company. This included $69,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Behbahani:

---

[9] Consists of 87 shares held by Defendant Behbahani and 20,962 shares that may be acquired pursuant to the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018.

*Ali Behbahani, M.D.* has served on our board of directors since September 2014. Dr. Behbahani joined New Enterprise Associates, Inc., or NEA, in 2007 and is a Partner on the healthcare team. Prior to joining NEA, Dr. Behbahani worked as a consultant in business development at The Medicines Company, a specialty pharmaceutical company developing acute care cardiovascular products. Dr. Behbahani previously held positions as a venture associate at Morgan Stanley Venture Partners and as a healthcare investment banking analyst at Lehman Brothers. He conducted basic science research in the fields of viral fusion inhibition and structural proteomics at the National Institutes of Health and at Duke University. Dr. Behbahani currently serves on the board of directors of several private companies. Dr. Behbahani has also been a director of Adaptimmune Therapeutics plc, a public biopharmaceutical company, since September 2014, and serves on the nominating and governance committee. Dr. Behbahani has been a director of Genocea Biosciences, Inc., a public biopharmaceutical company, since February 2018 and serves on the audit committee. Dr. Behbahani holds an M.D. from The University of Pennsylvania School of Medicine, an M.B.A. from The University of Pennsylvania Wharton School and a B.A. in Biomedical Engineering, Electrical Engineering and Chemistry from Duke University. We believe that Dr. Behbahani is qualified to serve on our Board due to his experience in the life science industry and his investment experience.

### Defendant Earnhardt

48.     Defendant Lisa Earnhardt ("Earnhardt") has served as a Company Director since 2015 and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant Earnhardt beneficially owned 12,205 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Earnhardt owned approximately $1.1 million worth of Nevro stock.

49.     For the fiscal year ended December 31, 2017, Defendant Earnhardt received $297,903 in compensation from the Company. This included $73,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

50.     The Company's 2018 Proxy Statement stated the following about Defendant Earnhardt:

*Lisa D. Earnhardt* has served on our Board since June 2015.  She has served as President and Chief Executive Officer of Intersect ENT and as a member of its board of directors since March 2008. Prior to joining Intersect ENT, Ms. Earnhardt served as President of Boston Scientific's Cardiac Surgery division (formerly known as Guidant Corporation, or Guidant) from June 2006 to January 2008 until its sale to Getinge Group. From August 1996 to April 2006, Ms. Earnhardt worked at Guidant in a variety of sales and marketing

---

[10] Consists of 12,205 shares that may be acquired pursuant to the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018.

leadership positions. Ms. Earnhardt served on the board of directors of Kensey Nash, a publicly traded company from 2011 until it was acquired by Royal DSM NA in 2012, where she served on the board's nominating and governance and audit committees. Ms. Earnhardt holds an M.B.A. from Northwestern's Kellogg School of Management and a B.S. in Industrial Engineering from Stanford University. We believe that Ms. Earnhardt is qualified to serve on our Board due to her operational and management experience in the medical device industry.

51.     Upon information and belief, Defendant Earnhardt is a citizen of the State of California.

**Defendant Fischer**

52.     Defendant Frank Fischer ("Fischer") has served as a Company Director since 2012. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant Fischer beneficially owned 50,132 shares of the Company's common stock.[11] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Fischer owned over $4.3 million worth of Nevro stock.

53.     For the fiscal year ended December 31, 2017, Defendant Fischer received $291,903 in compensation from the Company. This included $67,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

54.     The Company's 2018 Proxy Statement stated the following about Defendant Fischer:

***Frank Fischer*** has served on our board of directors since October 2012. Mr. Fischer joined NeuroPace, Inc., a privately held developer of treatment devices for neurological disorders, in 2000 and currently serves as its President and Chief Executive Officer. From May 1998 to September 1999, Mr. Fischer was President, Chief Executive Officer and a director of Heartport, Inc., a formerly publicly traded cardiac surgery company (later acquired by Johnson & Johnson in 2001). From 1987 to 1997, Mr. Fischer served as President and Chief Executive Officer of Ventritex, Inc., a publicly-traded designer, developer, manufacturer and marketer of implantable defibrillators and related products for the treatment of ventricular tachycardia and ventricular fibrillation, which was acquired by St. Jude Medical in 1997. Mr. Fischer currently serves on the board of directors of several privately held companies. Mr. Fischer received a B.S. in Mechanical Engineering and a M.S. in Management from Rensselaer Polytechnic Institute. We believe that Mr. Fischer is qualified to serve on our Board due to his extensive operational and management experience in the life science and medical device industries.

---

[11] Consists of 29,170 shares of common stock and 20,962 shares that may be acquired pursuant to the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018.

55.     Upon information and belief, Defendant Fischer is a citizen of the State of California.

**Defendant Jaeger**

56.     Defendant Dr. Wilfred E. Jaeger ("Jaeger") has served as a Company Director since 2012, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant Jaeger beneficially owned 532,113 shares of the Company's common stock, representing 1.8% of the Company's outstanding shares as of that date.[12] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Jaeger owned approximately $45.9 million worth of Nevro stock.

57.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Jaeger made the following sales of the Company's stock, and made no purchases of Company stock:

| Date | Number of Shares | Price[13] | Proceeds |
|---|---|---|---|
| February 27, 2018 | 14,458 | $83.00-84.35 | $ 1,204,045 |
| February 28, 2018 | 15,000 | $81.04-83.25 | $ 1,234,303 |
| March 1, 2018 | 10,000 | $79.50-81.25 | $   804,843 |
| March 5, 2018 | 42,116 | $80.00-80.64 | $ 3,378,024 |
| March 6, 2018 | 50,840 | $80.00-80.82 | $ 4,086,555 |

Thus, in total, before the fraud was exposed, he sold 200,000 shares of the Company's stock on inside information, for which he received over $16.2 million. His insider sales made with knowledge of material

[12] Consists of 20,962 shares that may be acquired pursuant to the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018, and: (a) 500,109 shares held by Three Arch Partners IV, L.P. ("Partners") and (b) 11,042 shares held by Three Arch Associates IV, L.P. ("Associates"). Three Arch Management IV, LLC (the "General Partner") is the general partner of Partners and Associates. Defendant Jaeger is a managing member of the General Partner. As the managing member of the General Partner he, together with Mark Wan, may be deemed to have voting and dispositive power over the shares held by Partners and Associates, and may be deemed to beneficially own certain of the shares held by Partners and Associates. Such persons and entities disclaim beneficial ownership of all shares held by Three Arch Partners IV, L.P. and Three Arch Associates IV, L.P. in which they do not have an actual pecuniary interest. .

[13] Price ranges in this column represent the range of prices at which Defendant Jaeger sold stock on the date in question. Proceeds have been calculated using the weighted average sale price listed in the relevant Form 4's filed with the SEC.

non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

58.     For the fiscal year ended December 31, 2017, Defendant Jaeger received $306,903 in compensation from the Company. This included $82,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

59.     The Company's 2018 Proxy Statement stated the following about Defendant Jaeger:

> **Wilfred E. Jaeger, M.D.** has served on our board of directors since January 2012. Dr. Jaeger cofounded Three Arch Partners in 1993 and has served as a Partner and Managing Member since that time. Prior to co-founding Three Arch Partners, Dr. Jaeger was a general partner at Schroder Ventures. Dr. Jaeger currently serves on the board of directors of Concert Pharmaceuticals, Inc., a public clinical stage biopharmaceutical company, as well as numerous private companies. Dr. Jaeger received a B.S. in Biology from the University of British Columbia, an M.D. from the University of British Columbia School of Medicine and an M.B.A from the Stanford Graduate School of Business. We believe that Dr. Jaeger is qualified to serve on our Board due to his investment experience, strategic leadership track record and service on other boards of directors of life sciences companies.

60.     Upon information and belief, Defendant Jaeger is a citizen of the State of California.

**Defendant McCormick**

61.     Defendant Shawn T. McCormick ("McCormick") has served as a Company Director since 2014, and is the Chair of the Audit Committee. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant McCormick beneficially owned 26,614 shares of the Company's common stock.[14] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, McCormick owned approximately $2.3 million worth of Nevro stock.

62.     For the fiscal year ended December 31, 2017, Defendant McCormick received $304,903 in compensation from the Company. This included $80,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

63.     The Company's 2018 Proxy Statement stated the following about Defendant McCormick:

---

[14] Consists of 26,614 shares of common stock issuable upon the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018.

*Shawn T McCormick* has served on our board of directors since September 2014. Mr. McCormick served as Chief Financial Officer of Tornier N.V., a public medical device company, from September 2012 to October 2015 when Tornier merged with Wright Medical Group. From April 2011 to February 2012, Mr. McCormick was Chief Operating Officer of Lutonix, Inc., a medical device company acquired by C. R. Bard, Inc. in December 2011. From January 2009 to July 2010, Mr. McCormick served as Senior Vice President and Chief Financial Officer of ev3 Inc., a public endovascular device company acquired by Covidien plc in July 2010. From May 2008 to January 2009, Mr. McCormick served as Vice President, Corporate Development at Medtronic, Inc., a public medical device company, where he was responsible for leading Medtronic's worldwide business development activities. From 2007 to 2008, Mr. McCormick served as Vice President, Corporate Technology and New Ventures of Medtronic. From 2002 to 2007, Mr. McCormick was Vice President, Finance for Medtronic's Spinal, Biologics and Navigation business. Prior to that, Mr. McCormick held various other positions with Medtronic, including Corporate Development Director, Principal Corporate Development Associate, Manager, Financial Analysis, Senior Financial Analyst and Senior Auditor. Prior to joining Medtronic, he spent four years with the public accounting firm KPMG Peat Marwick. He was a director of Entellus Medical, Inc., a public medical device company, and served as the chairman of the audit committee and as a member of the nominating and corporate governance committee from November 2014 to February 2018 when Entellus was sold to Stryker. Mr. McCormick has been a director of SurModics, Inc., a public medical device and in vitro diagnostic technologies company, since December 2015 and serves on the audit committee and corporate governance and nominating committee.  Mr. McCormick earned his M.B.A. from the University of Minnesota's Carlson School of Management and his B.S. in Accounting from Arizona State University. He is a Certified Public Accountant (inactive license). We believe that Mr. McCormick is qualified to serve on our Board due to his financial expertise and extensive operational experience in the medical device industry.

**Defendant Vale**

64.     Defendant Dr. Brad Vale ("Vale") has served as a Company Director since 2015. According to the 2018 Proxy Statement, as of March 28, 2018, Defendant Vale beneficially owned 23,234 shares of the Company's common stock.[15] Given that the price per share of the Company's common stock at the close of trading on March 28, 2018 was $86.21, Vale owned over $2 million worth of Nevro stock.

65.     For the fiscal year ended December 31, 2017, Defendant Vale received $287,903 in compensation from the Company. This included $63,000 in fees earned or paid in cash, $112,465 in stock awards, and $112,438 in option awards.

---

[15] Consists of 2,000 shares held by Defendant Vale and 21,234 shares of common stock issuable upon the exercise of stock options or the delivery of shares underlying RSUs within 60 days of March 28, 2018.

66.     The Company's 2018 Proxy Statement stated the following about Defendant Vale:

**Brad Vale, Ph.D., D.V.M.,** has served on our board of directors since March 2015. Dr. Vale was Head of Johnson & Johnson Development Company, or JJDC, from January 2012 to March 2015. Dr. Vale joined JJDC in March 1992, and in April 2008, was appointed to the position of Vice President, Head of Venture Investments. From September 1989 to March 1992, Dr. Vale supported Johnson & Johnson's medical device businesses at the Corporate Office of Science and Technology as an Executive Director. From 1982 to 1989, he was at Ethicon, Inc., a Johnson & Johnson subsidiary, working on preclinical studies, new business development, and a coronary artery bypass graft internal venture. Dr. Vale currently serves or has served on the board of directors of several private companies. Dr. Vale holds a Ph.D. from Iowa State University, a D.V.M. from Washington State University and a B.S. in Chemistry and Biology from Beloit College. We believe that Dr. Vale is qualified to serve on our Board due to his investment experience and strategic leadership in the life sciences industry.

67.     Upon information and belief, Defendant Vale is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.     By reason of their positions as officers and/or directors of Nevro and because of their ability to control the business and corporate affairs of Nevro, the Individual Defendants owed Nevro and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Nevro in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Nevro and its shareholders so as to benefit all shareholders equally.

69.     Each director, officer, and controller of the Company owes to Nevro and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Nevro, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers and directors of Nevro were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Nevro, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Nevro's Board at all relevant times.

73.     As senior executive officers, directors, and controllers of a publicly-traded company the common stock of which was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it improperly failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Moreover, the Company's directors had a duty not to cause the Company to waste corporate assets by

engaging in the Trade Secrets Misconduct and thereby exposing the Company to substantial and foreseeable litigation costs.

74.  To discharge their duties, the officers and directors of Nevro were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Nevro were required to, among other things:

(a)  ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of California, Delaware, and the United States, and pursuant to Nevro's own Code of Conduct and Ethics;

(b)  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)  remain informed as to how Nevro conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)  establish and maintain systematic and accurate records and reports of the business and internal affairs of Nevro and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)  maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Nevro's operations would comply with all applicable laws and Nevro's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.    Each of the Individual Defendants further owed to Nevro and the shareholders the duty of loyalty requiring that each favor Nevro's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Nevro and were at all times acting within the course and scope of such agency.

77.    Because of their advisory, executive, managerial, directorial, and controlling positions with Nevro, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Nevro.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to

conceal the true facts as alleged herein and caused the Company to waste corporate assets as a result of the Trade Secrets Misconduct. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act,; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (3) engage in the Trade Secrets Misconduct; and (4) artificially inflate the Company's stock price.

81.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. The Individual Defendants also caused the Company to waste corporate assets as a result of the Trade Secrets Misconduct. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Nevro was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

82.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Nevro, and was at all times acting within the course and scope of such agency.

## NEVRO'S CODE OF CONDUCT

84. The Company's Code of Conduct and Ethics (the "Code" or "Code of Conduct") "applies to all Team Members, including officers and members of the Board of Directors of Nevro," as well as consultants and agents of Nevro.

85. With respect to "Corporate Citizenship," the Code of Conduct states, in relevant part:

We have a legal or ethical responsibility to:

• Create a work environment based on shared values of integrity and excellence.

• *Maintain behavior that is lawful and ethical at all times*.

• Promote high standards by *conducting our affairs in a clearly ethical manner*.

• Be aware and *obey applicable laws and regulations in all communities where we do business*.

(Emphasis added.)

86. Regarding the "Duty of Confidentiality," the Code of Conduct provides, in relevant part, that:

Nevro understands the value of its confidential information. Likewise, *the Company recognizes that other companies also value their confidential information. Nevro Team Members therefore also have a responsibility not to disclose confidential information procured by previous employment opportunities*. We value our confidences as well as those of other companies. *Nevro will honor applicable confidentiality agreements proffered by persons or entities with whom Nevro does business*. Likewise, *Nevro requires that Team Members respect the confidentiality of other persons or entities, including past employers*. For example, *team members are not to improperly use or disclose any confidential information, intellectual property or trade secrets, if any, of any former employer or any other person to whom the team member has an obligation of confidentiality. Team Members will also not bring onto Nevro property any unpublished documents or any property belonging to any former employer or any other person to whom the team member has an obligation of confidentiality unless expressly authorized in writing by that former employer or person*. Team Members will use, in the performance of their duties only, information which is generally known and used by

persons with training and experience comparable to their own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by Nevro.

(Emphasis added.)

87.     The Code of Conduct provides, regarding financial integrity and public reporting, in relevant part, that:

Nevro's books and records must be accurate and complete and must be prepared and maintained in the manner specified by the Company. All financial records must comply with generally accepted accounting principles and any other financial recordkeeping and reporting laws.

**a.  Recordkeeping Integrity**

No Team Member should ever create or assist anyone to create a false or misleading entry in any book or business record of Nevro, including any business expense or Team Member time report. Unrecorded assets or liabilities, or "hidden" funds, are always prohibited. No Team Member may make false or misleading statements during a financial audit by Nevro, independent auditors, or an Official.

**b.  Financial Disclosure**

All Nevro Team Members who participate in the preparation or dissemination of financial information have a legal and ethical duty to ensure that the content of the disclosure is accurate, complete, and timely.

88.     The Code of Conduct states, regarding "Public Disclosures and Reporting," that:

Nevro is committed to the transparency and integrity of our publicly--filed financial reports and other communications. ***Our President and CEO, CFO, and people who perform similar functions are responsible for ensuring that the disclosure in the Company's periodic reports is full, fair, accurate, timely, and understandable***.

(Emphasis added.)

89.     Regarding "Insider Trading," the Code of Conduct provides that:

Nevro and all Team Members have an obligation to comply with the United States securities laws. Both civil and criminal penalties can result from failure to comply with such laws. ***Nevro maintains an Insider Trading Compliance Policy, which all Team Members, including officers and directors, and consultants must adhere to***. Anyone subject to the Insider Trading Compliance Policy should review the entirety of that policy in detail and should direct any questions to the Chief Compliance Officer or the Legal Department. For more information the trading in the Company's securities, please see the Company's Insider Trading Compliance Policy.

(Emphasis added.)

90.     The Code of Conduct provides, as to "Compliance and Reporting," in relevant part, that:

This Code of Conduct is only effective if every Team Member of Nevro faithfully complies with its terms. *If a Team Member knows of a violation or possible violation of the Code of Conduct, the Team Member must immediately report it to his or her manager, a Human Resources representative or Chief Compliance Officer.* Nevro has designated a Compliance Committee and a Chief Compliance Officer to oversee the implementation of a Compliance Program. The Compliance Committee will administer and maintain this Code of Conduct, under the direction of the Board of Directors or, if appropriate, a Committee of the Board of Directors, to ensure that Company activities comply with local laws and regulations, and to disseminate relevant educational training materials to Nevro Team Members.

(Emphasis added.)

91.     The Code of Conduct provides, as to waivers thereof, that:

Any material amendment or waiver of any provision of this Code of Conduct must be approved by the Board of Directors or, if appropriate, a Committee of the Board of Directors, and must be promptly disclosed as may be required pursuant to applicable laws and regulations. Notwithstanding the foregoing, the Board of Directors or the Committee of the Board of Directors may delegate its ability to grant waivers under this Code of Conduct for the Team Members, other than members of the Board of Directors, executive officers or senior financial officers, and must disclose such waiver to the Compliance Committee. Any waiver or modification of this Code of Conduct for a senior financial officer will be promptly disclosed to stockholders as required by applicable law or the rules of the stock exchange on which the Company's stock is listed for trading.

92.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act and the Trade Secrets Misconduct. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, protect the confidentiality of other entities information and properly report violations of the Code of Conduct.

### NEVRO'S AUDIT COMMITTEE CHARTER

93.     The Company's has adopted an Audit Committee Charter, which provides that the responsibilities of the Audit Committee include to:

> ***report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements***, the performance, qualifications and independence of the Company's independent auditor, the performance of the Company's internal audit function, if any, or any other matter the Committee determines is necessary or advisable to report to the Board. . . . The Committee will also establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters.

(Emphasis added.)

94.     The Audit Committee Charter Provides that the responsibilities of the Audit Committee include the following:

> ***The Committee shall review and discuss with management and the independent auditor***: (i) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and ***major issues as to the adequacy of the Company's internal controls*** and any special audit steps adopted in light of material control deficiencies, if any; (ii) any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements and (iv) the type and presentation of information to be included in earnings press releases, as well as any financial information and earnings guidance provided to analysts and rating agencies.

(Emphasis added.)

95.     The re Audit Committee is also granted "Other Powers and Responsibilities" under the Audit Committee Charter, which include the following:

> ***The Committee shall discuss with the Company's general counsel, if any, or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements***.

* * *

*The Committee shall cause the Company to implement, maintain and monitor an ethics helpline that is designed to receive anonymous reports of any known or suspected violations of the Company's Code of Business Conduct and Ethics or any applicable laws and regulations*. The Committee shall investigate any reports received through the ethics helpline and report to the Board periodically with respect to the information received through the ethics helpline and any related investigations.

\* \* \*

*The Committee, through its Chair, shall report regularly to, and review with, the Board* (i) any material issues that arise with respect to the Committee's performance of the foregoing responsibilities, and (ii) *any issues that arise with respect to* the quality or integrity of the Company's financial statements, *the Company's compliance with legal or regulatory requirements,* the performance and independence of the Company's independent auditor, the performance of the Company's internal audit function, if any, or any other matter the Committee determines is necessary or advisable to report to the Board

96.     In violation of the Audit Committee Charter, Defendants McCormick, Earnhardt and Jaeger failed to, among other things, effectively discuss with management the Company's disclosure controls and internal controls over financial reporting and compliance with legal requirements.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.     Nevro is a medical device company focused on the treatment of chronic pain.

98.     Nevro's lead and only products are the Sensa Systems, which deliver the Company's HF10 therapy to individual patients. As revealed in the Company's Form 10-K for the fiscal year ended December 31, 2017 10-K, the Company "do[es] not have any other products currently in development." Thus, the development and commercialization of the Senza Systems, and is HF10 therapy, is highly material to the Company.

### The Trade Secrets Misconduct

99.     As alleged in the Boston Scientific Action, the Individual Defendants caused the Company to improperly obtain the intellectual property of Boston Scientific through a campaign of hiring former employees of Boston Scientific and those individuals divulging Boston Scientific's confidential information to Nevro and its employees.

100.   In the most egregious example noted int the Boston Scientific Action, Nevro hired a former employee of Boston Scientific who took with him thousands of pages of proprietary Boston Scientific documents when he departed Boston Scientific. The employee then, in violation of his confidentiality agreement with Boston Scientific, shared at least some of these documents, which were clearly marked as either "proprietary" or "confidential," with other employees of Nevro.

101.   The Trade Secrets Misconduct led to the filing of the Boston Scientific Action, forcing the Company to bear the significant costs associated with defending that action.

**False and Misleading Statements**

102.   On January 8, 2018, the Company issued a press release, which was also filed as an attachment to a Form 8-K filed with the SEC on the same date, announcing the Company's preliminary financial results for the year and quarter ended December 31, 2017.  The press release "announced that preliminary unaudited fourth quarter worldwide revenue is expected to be in the range of $97.4 to $97.9 million." Regarding Nevro, the press release stated, in relevant part:

> Nevro has developed and commercialized the SENZA® spinal cord stimulation (SCS) system, an evidence-based, non-pharmacologic neuromodulation platform for the treatment of chronic pain. The SENZA® system is the only SCS system that delivers ***Nevro's proprietary HF10™ therapy***. Senza, Senza II, HF10, Nevro and the Nevro logo are trademarks of Nevro.

(Emphasis added.)

103.   The Company issued a second press release on January 8, 2018, titled "Nevro Receives FDA Approval for Senza II™ Spinal Cord Stimulation System Delivering HF10™ Therapy." Regarding its Senza II system and HF10 therapy, the press release stated, in relevant part:

> ***The Senza II system delivers Nevro's proprietary HF10 therapy***, an SCS therapy that provides electrical pulses to the spinal cord to alleviate pain. The electrical pulses are delivered by small electrodes on leads that are placed near the spinal cord and are connected to a compact, battery-powered generator implanted under the skin. HF10 therapy is the only SCS therapy indicated to provide pain relief without paresthesia (a stimulation-induced sensation, such as tingling or buzzing, which is the basis of traditional SCS) and is also the first SCS therapy to demonstrate superiority to traditional SCS for back and leg pain in a comparative pivotal study. ***Nevro's innovations in SCS, including the Senza®***

**and Senza II™ systems and HF10™ therapy, are covered by more than 140 issued U.S. and international patents**.

(Emphasis added.)

104.    On January 12, 2018, the Company issued a press release announcing participation in the North American Neuromodulation Society ("NANS") annual meeting. Regarding its Senza Systems and HF10 therapy, the press release stated, in relevant part:

> **The Senza system is the only SCS system that delivers Nevro's proprietary HF10 therapy**, an SCS therapy that provides electrical pulses to the spinal cord to alleviate pain. The electrical pulses are delivered by small electrodes on leads that are placed near the spinal cord and are connected to a compact, battery-powered pulse generator implanted under the skin. HF10 therapy is the only SCS therapy indicated to provide pain relief without paresthesia and is also the first SCS therapy to demonstrate superiority to traditional SCS for back and leg pain in a comparative pivotal study. **Nevro's innovations in SCS, including the Senza® system and HF10™ therapy, are covered by more than 100 issued U.S. and international patents**.

(Emphasis added.)

105.    On February 8, 2018, the Company issued a press release announcing that it would be reporting its operating results for the year and quarter ended December 31, 2017 on February 22, 2018. Regarding Nevro, the press release stated, in relevant part:

> Nevro has developed and commercialized the SENZA® spinal cord stimulation (SCS) system, an evidence-based, non-pharmacologic neuromodulation platform for the treatment of chronic pain. **The SENZA® system is the only SCS system that delivers Nevro's proprietary HF10™ therapy**.

(Emphasis added.)

106.    On February 22, 2018, the Company issued a press release, which was also filed as an attachment to a Form 8-K filed with the SEC on the same date, announcing the Company's financial results for the year and quarter ended December 31, 2017. In addition to announcing fourth quarter revenue of $98 million, the February 22, 2018 press release contained the same statement included the in January 8, 2018 press release regarding the proprietary nature of the Company's HF10 therapy, which is quoted above.

107.   The Company filed its report for the quarter and year ended December 31, 2017 on Form 10-K (the "2017 10-K") with the SEC on February 22, 2018. The 2017 10-K was signed by Defendants Elghandour, Galligan, DeMane, Behbahani, Earnhardt, Fischer, Jaeger, McCormick, and Vale.

108.   The 2017 10-K began with an Overview of the Company's business, stating the following regarding the proprietary nature of the Company's pain therapies:

> We are a global medical device company focused on providing innovative products that improve the quality of life of patients suffering from chronic pain. ***We have developed and commercialized the Senza® spinal cord stimulation (SCS) system, an evidence-based neuromodulation platform for the treatment of chronic pain. Our proprietary paresthesia-free HF10™ therapy, delivered by our Senza system, was demonstrated in our SENZA-RCT study to be superior to traditional SCS therapy with it being nearly twice as successful in treating back pain and 1.5 times as successful in treating leg pain when compared to traditional SCS therapy***. Comparatively, traditional SCS therapy has limited efficacy in treating back pain and is used primarily for treating leg pain, limiting its market adoption. Our SENZA-RCT study, along with our European studies, represents what we believe is the most robust body of clinical evidence for any SCS therapy. We believe the superiority of HF10 therapy over traditional SCS therapies will allow us to capitalize on and expand the approximately $2.0 billion existing global SCS market by treating both back and leg pain without paresthesia.

109.   In concluding its overview of the Company's business, the 2017 10-K stated, in relevant part:

> ***We believe we have built competitive advantages through our proprietary technology***, clinical evidence base, strong track record of execution with over 28,000 patients implanted with Senza, ***extensive intellectual property*** and a proven management team with substantial neuromodulation experience. With the well-demonstrated superior efficacy of our HF10 therapy, we aim to continue to drive adoption and penetration in the U.S. market, which represents the largest opportunity in SCS, and expand patient access to HF10 therapy by investing in the development of evidence for new indications such as chronic upper limb and neck pain, painful neuropathies and non-surgical refractory back pain.

(Emphasis added.)

110.   Regarding the Company's "Growth Strategy," the 2017 10-K stated, in relevant part:

> **Invest in research and development to drive innovation:** We are extending ***our novel and proprietary technologies into a series of product enhancements*** with the goal of improving the treatment of chronic pain. Product enhancements have recently included a next-generation IPG and enhanced MRI capability, both of which were approved in Europe in 2017, with the next-generation IPG, or Senza II, gaining approval by the FDA in January 2018. Further, we have commercially launched our surgical leads, marketed as

the Surpass surgical lead, which we believe will give access to approximately 30% of the U.S. SCS market that we previously did not address fully without the surgical lead. We also expect to continue developing enhancements to Senza to further increase performance and introduce new benefits including next generation IPGs and enhanced MRI capabilities. We believe that further product enhancements if and when completed will drive continued adoption of our technology platform and further validate the advantages and benefits of our HF10 therapy.

**Scale our business to achieve cost and production efficiencies:** We plan to improve the efficiency of our third-party manufacturing processes, which we believe will lower our per unit manufacturing cost. ***We expect to continue to scale our manufacturing operations as we expand Senza sales volumes in the United States***.

(Bold subheadings in original, bold & italic emphasis added.)

111.    Regarding the Company's internal controls, the 2017 10-K stated, in relevant part:

The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the Exchange Act) refers to controls and procedures that are designed to provide reasonable assurance that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and our management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their control objectives.

***Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2017,*** the end of the period covered by this Annual Report. Based upon such evaluation, ***our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of such date***.

(Emphasis added.)

112.    Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Elghandour and Galligan attesting to the accuracy of the 2017 10-K

113.    Also on February 22, 2018, the Company held an earnings call with analysts and investors to discuss its financial results for the year and quarter ended December 31, 2017. Regarding Nevro's sales revenue, Defendant Elghandour stated, in relevant part:

> Worldwide revenue for the fourth quarter was 98 million, an increase of 39% as reported compared to the same period of the prior year. U.S. revenue for the quarter was 81.1 million, an increase of 45%. Fourth quarter international revenue was 16.9 million, representing an increase of 10% on a constant currency basis. ***These results are driven by continued adoption and demand for HF10 globally and consistent execution by our sales team***.

(Emphasis added.)

114.    Regarding the Senza systems, Defendant Elghandour stated, in relevant part:

> Our R&D and regulatory team secured three key approvals; our Surpass surgical lead, Senza II CE Mark and Senza I Full Body MRI CE Mark. ***Our clinical team continued to advance the platform applicability of HF10 with outstanding research demonstrating the long-term potential for our therapy in a number of new pain areas***.

(Emphasis added.)

115.    On March 22, 2018, the Company issued a press release titled "Full-Body MRI Conditional Labeling Now Available in United States for Nevro Senza® Spinal Cord Stimulation System." Regarding Nevro and the Senza Systems, hat press release stated, in relevant part:

> ***The Senza® and Senza II™ systems are the only SCS systems that deliver Nevro's proprietary HF10® therapy***, an SCS therapy that provides electrical pulses to the spinal cord to alleviate pain. The electrical pulses are delivered by small electrodes on leads that are placed near the spinal cord and are connected to a compact, battery-powered generator implanted under the skin. HF10 therapy is the only SCS therapy indicated to provide pain relief without paresthesia (a stimulation-induced sensation, such as tingling or buzzing, which is the basis of traditional SCS) and is also the first SCS therapy to demonstrate superiority to traditional SCS for back and leg pain in a comparative pivotal study. ***Nevro's innovations in SCS, including the Senza System and Senza II System and HF10 Therapy, are covered by more than 150 issued U.S. and international patents***.

(Emphasis added.)

116.    The statements in ¶¶ 102-115 herein were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically,

the Individual Defendants improperly failed to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions, as well as increased litigation expenses; (4) due to the Trade Secrets Misconduct, the Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

117.    On April 6, 2018, the Company issued the 2018 Proxy Statement, which was signed by Defendant Elghandour. Defendants Elghandour, DeMane, Behbahani, Earnhardt, Fischer, Jaeger, McCormick, and Vale solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[16]

118.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> We have adopted a Code of Conduct and Ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The Code of Conduct and Ethics is available in the "Corporate Governance" section of our website at http://www.nevro.com/. We expect that any amendments to the Code of Conduct and Ethics, or any waivers of its requirements, will be disclosed on our website. The reference to our web address does not constitute incorporation by reference of the information contained at or available through our website.

119.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as multiple Individual Defendants allowed false and misleading statements to be issued to the investing public, and the Individual Defendants caused the Company to engage in the Trade Secrets Misconduct.

120.    The 2018 Proxy Statement stated, regarding insider trading, that:

---

[16] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Our Insider Trading Policy provides that ***no officer, director, employee or consultant, or any immediate family member or any member of the household of any such person, shall purchase or sell any type of security while in possession of material, non-public information relating to the security***, whether the issuer of such security is the Company or any other company. This prohibition includes any interest or position relating to put options, call options or short sales, or engaging in hedging transactions. In addition, our Insider Trading Policy provides that no employee, officer or director may pledge Company securities as collateral to secure loans. This prohibition means, among other things, that these individuals may not hold Company securities in a "margin" account, which would allow the individual to borrow against their holdings to buy securities.

(Emphasis added.)

121.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Insider Trading Policy was not followed, as two Individual Defendants sold shares of Company stock while in possession of material, non-public information about Nevro, for combined proceeds in excess of $17.3 million.

122.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including an "equity-based compensation to [] executive officers in order to link the interests and risks of our executive officers with those of [] stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

123.    The 2018 Proxy Statement also failed to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions, as well as increased litigation expenses; (4) due to the Trade Secrets Misconduct, the Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

124.     On April 23, 2018, the Company filed a press release announcing that it would report its operating results for the quarter ended March 31, 2018 after markets closed on May 7, 2018. Regarding Nevro, the press release stated, in relevant part, that "Nevro has developed and commercialized the Senza® spinal cord stimulation (SCS) system, an evidence-based, non-pharmacologic neuromodulation platform for the treatment of chronic pain. The Senza® system and Senza II™ system are the only SCS systems that deliver Nevro's proprietary HF10® therapy."

125.     The statements the April 23, 2018 press release quoted above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions, as well as increased litigation expenses; (4) due to the Trade Secrets Misconduct, the Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

126.     On April 27, 2018 Boston Scientific filed the Boston Scientific Action in the United States District Court for the District of Delaware. The Boston Scientific Action alleged patent infringement, theft of trade secrets, and tortious interference with contract against Nevro. Boston Scientific's complaint alleged that the Company violated at least four of Boston Scientific's U.S. patents.

127.     The Boston Scientific Action alleged that Nevro had, beginning no later than 2009, engaged in a scheme whereby the Company hired no less than 48 former employees of Boston Scientific, including Defendant Earnhardt, many of whom were involved in developing SCS technology for Boston

Scientific. Boston Scientific alleges that Nevro and used those hires to improperly obtain confidential and proprietary trade secrets of Boston Scientific in order to develop the Senza Systems.

128.    One such employee is Nevro's Director of Field Engineering, Jim Thacker ("Thacker"). Thacker was employed by Boston Scientific between 2000 and 2006 as Manager of Field Clinical Engineering, helping to develop SCS technologies. Thacker entered into a confidentiality agreement with Boston Scientific as a condition of his employment, requiring that Thacker keep all confidential information and trade secrets of Boston Scientific learned during the course of his employment, both during the term of his employment and thereafter.

129.    The Boston Scientific Action alleges that upon Thacker's voluntary departure from Boston Scientific in 2006, Thacker represented to Boston Scientific in his exit interview that he was not in possession of any property owned by Boston Scientific.

130.    However, contrary to this representation, Boston Scientific alleges that Thacker was in possession of more than 34,000 "confidential Boston Scientific documents," including laboratory notebooks detailing work performed in clinical trials of Boston Scientific's Precision™ SCS system, as well as Boston Scientific-owned thumb drives, actual Precision™ demonstration devices, Physician lead manuals, Physician implant manuals, and Precision™ media kits."

131.    Boston Scientific further alleges that Thacker disclosed such confidential and proprietary information to Nevro and employees of Nevro, and such documents were marked as confidential or proprietary.

132.    Regarding the value of these confidential and proprietary materials to Nevro, Boston Scientific alleged, in relevant part:

> ***Nevro's possession of Boston Scientific's internal clinical investigation protocol for its Precision™ SCS product would have been of value to Nevro***, who during the relevant time period was developing its own SCS system, and conducting its own clinical investigations. ***Since Nevro had never developed an SCS product before, the Stimulus Confirmatory Study disclosed by Mr. Thacker provided Nevro with a necessary tool to develop its own clinical investigation protocol***. Upon information and belief, Nevro has

used the information provided by Mr. Thacker in connection with its business activities, including in its research and development, design, clinical investigation, and testing of the Senza Systems.

(Emphasis added.)

133.    On this news, the Company's share price fell $1.46, or 1.6%, from its closing price on April 27, 2018, closing at $89.36 per share on April 30, 2018, the following trading day.

134.    On May 2, 2018, the Company issued a press release titled "Nevro to Present at the Bank of America Merrill Lynch 2018 Health Care Conference." Regarding Nevro, the press release stated, in relevant part: "Nevro has developed and commercialized the Senza® spinal cord stimulation (SCS) system, an evidence-based, non-pharmacologic neuromodulation platform for the treatment of chronic pain. The Senza® system and Senza II™ system are the only SCS systems that deliver Nevro's proprietary HF10® therapy."

135.    After markets closed on May 7, 2018, Nevro issued a press release announcing its financial results for the quarter ended March 31, 2018. The press release was included as an exhibit to a Form 8-K filed with the SEC the same day. While press release announced a 33% increase in year-over-year revenue in the quarter, it revealed that operating expenses had also increased 31%, due in part to the Boston Scientific Action, stating, in relevant part:

> Operating expenses for the three months ended March 31, 2018 were $77.7 million compared to $59.4 million in the same period of the prior year, ***representing an increase of 31%. The increase in operating expenses was driven primarily by*** increased headcount and related personnel costs, as well as ***legal expenses associated with intellectual property litigations.***

(Emphasis added.)

136.    Despite the allegations in the Boston Scientific Action, the May 7, 2018 press release stated the following about the Company: "Nevro has developed and commercialized the Senza spinal cord stimulation (SCS) system, an evidence-based, non-pharmacologic neuromodulation platform for the

treatment of chronic pain. The Senza® System and Senza II™ System are the only SCS systems that deliver Nevro's proprietary HF10® therapy."

137.    Also on May 7, 2018, the Company filed its quarterly report with the SEC for the quarter ended March 31, 2018 on Form 10-Q (the "2018 Q1 10-Q"). The 2018 Q1 10-Q was signed by Defendants Elghandour and Galligan.

138.    In relevant part, the 2018 Q1 10-Q stated the following regarding the Company's internal controls and procedures:

**Evaluation of Disclosure Controls and Procedures**

The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act refers to controls and procedures that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Our management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and our management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their control objectives.

***Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2018, the end of the period covered by this Quarterly Report. Based upon such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of such date***.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting that occurred during the period covered by this Quarterly Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Bold subheadings in original. Bold and italic emphasis added.)

139.     Attached to the 2018 Q1 10-Q were SOX certifications signed by Defendants Elghandour and Galligan attesting to its accuracy.

140.     On the evening of May 7, 2018, the Company held a conference call with analysts and investors to discuss its financial results for the quarter ended March 31, 2018. Regarding growth of the Company and sales growth, Defendant Elghandour stated, in relevant part:

> ***Having said that, we remain in a dynamic growth phase and our ramping territories propelled us to deliver an industry high growth rate this quarter***. We continue to drive optimization of our sales structure, territories and systems in order to deliver sustainable growth as we scale. I'm confident in our sales team and I believe our focus and investment in our sales organization will result in continued growth as we advance towards market leadership.
>
> I recently had the opportunity to spend time with our sales team in the field and from my conversations with them and our customers I saw both the real impact we're having at our patients and the momentum we're building in our business.

(Emphasis added.)

141.     During the call, Defendant Galligan stated the following regarding the Company's operating expenses:

> Operating expenses for the first quarter of 2018 were $77.7 million, an increase of 31% compared to the first quarter of 2017. ***The increase in operating expenses was driven primarily by*** increased headcount and related personnel costs, as well as ***legal expenses associated with the Boston Scientific intellectual property litigations***.
>
> Legal expense in connection with those litigations was $8.6 million for the quarter, as compared to $2.4 million in the same quarter of last year. Net loss from operations for the period was $15.7 million compared to $13.1 million for the first quarter of 2017. ***Excluding the effect of the IP litigation spend in each period, we saw $3.5 million decrease or 33% improvement in net operating loss this quarter as compared to Q1 of 2017***.

(Emphasis added.)

142.     On this news, the Company's share price fell $14.67, or 15.9%, from its closing price on May 7, 2018, closing at $77.59 per share on May 8, 2018.

143.     The statements in ¶¶ 134, and 136-140 herein were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading.

Specifically, the Individual Defendants improperly failed to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions; (4) due to the Trade Secrets Misconduct, the Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

144. Morgan Stanley & Co. ("Morgan Stanley") downgraded its rating of Nevro to "Equal Weight" on July 2, 2018, citing the "key risk" associated with intellectual property litigation facing the Company. Morgan Stanley further noted that the Company's claims to clinical superiority were in question, stating, in relevant part:

> Nevro's commercial message around clinically superiority has not resonated as well since those initial concerns as competitors have gained traction and blunted Nevro's share gains since NANS 2017. ***Our channel diligence has shifted in recent months as doctors have highlighted lower real-world efficacy vs SENZA-RCT, the subjectivity of pain score reductions, and durable relief with alternate therapies*** (particularly Medtronic's Intellis/Evolve workflow), ***all suggesting the commercial path from here is likely to get harder for Nevro***.

(Emphasis added.)

145. On this news, the Company's share price fell $6.62, or 8.3%, from its closing price on June 29, 2018, the previous trading day, closing at $73.23 per share on July 2, 2018.

146. On July 5, 2018, a tentative ruling was issued in the Nevro Action by the Honorable Judge Vince Chhabria of the Northern District of California. The tentative ruling invalidated the majority of Nevro's patents, thereby threatening to end Nevro's case against Boston Scientific.

147. The market was notified of Judge Chhabria's ruling by numerous investment firms on July 10, 2018, after those firms issued reports describing the ruling.

148.    For example, Morgan Stanley's analyst note, issued July 10, 2018, stated that Judge Chhabria's "draft ruling on the Nevro/Boston IP litigation is likely pressuring shares this morning. The IP debate was a component of our recent downgrade." Zacks Investment Research lowered its rating of Nevro from hold to sell on the same date.

149.    Similarly, Northland Securities downgraded its rating of the Company's stock, noting the ongoing patent litigation and asserting that Judge Chhabria's tentative ruling, "if finalized could require a recalibration vis-à-vis Nevro's hold" on the relevant market.

150.    On this news, the Company's share price fell $11.43, or 15.1%, from its closing price on July 9, 2018, closing at $64.04 per share on July 10, 2018.

151.    Before markets opened on July 13, 2018, the Company filed a Form 8-K with the SEC announcing that it had "determined to terminate James Alecxih's, Vice President Worldwide Sales, employment with the Company." James Alexis had joined the Company as Vice President Worldwide Sales less than a year earlier, in December 2017. There was no explanation of the termination, nor was there any warning to the market that such a termination was impending.

152.    On this news, the Company's share price fell $10.27, or 15.1%, from its closing price on July 12, 2018, closing at $10.27 per share on July 13, 2018.

## DAMAGES TO NEVRO

153.    As a direct and proximate result of the Individual Defendants' conduct, Nevro has lost and will continue to lose and expend many millions of dollars.

154.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

155.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

156.    Further, these expenditures include, but are not limited to, funds expended on intellectual property litigation as a direct and foreseeable result of the Trade Secrets Misconduct.

157.    As a direct and proximate result of the Individual Defendants' conduct, Nevro has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future and cause the Company to lose customers due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

158.    Plaintiff brings this action derivatively and for the benefit of Nevro to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Nevro, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

159.    Nevro is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

160.    Plaintiff is, and has been at all relevant times, a shareholder of Nevro. Plaintiff will adequately and fairly represent the interests of Nevro in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

161.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

162.    A pre-suit demand on the Board of Nevro is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Elghandour, DeMane, Behbahani, Earnhardt, Fischer, Jaeger, McCormick, and Vale (collectively, the "Directors").

Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

163.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they knowingly or recklessly engaged to make and/or cause the Company to make false and misleading statements and omissions of material facts, while one of them engaged in insider sales based on material non-public information, netting proceeds of over $16.2 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Indeed, one of the Directors is a defendant in the Securities Class Action.

164.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in the scheme to make and/or cause the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus, excused.

165.    The Directors knew of the falsity of the misleading statements at the time they were made. The statements related to the Company's only devices available or approved for sale, the Senza Systems. The development and sale of medical devices, especially the Senza Systems, is the core operation of Nevro. As revealed in the 2017 10-K, since the Company's inception, it has "devoted substantially all of [its] efforts to the development and commercialization of Senza and HF10 therapy for the treatment of chronic leg and back pain," and the Company "do[es] not have any other products currently in development." Thus, the development and commercialization, of the Senza Systems, and intellectual property underlying them, are highly material to the Company's core operations.

166.     As Board members of Nevro, charged with overseeing the Company's affairs, Defendants Elghandour, DeMane, Behbahani, Earnhardt, Fischer, Jaeger, McCormick, and Vale all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Nevro, Defendants Elghandour, DeMane, Behbahani, Earnhardt, Fischer, Jaeger, McCormick, and Vale must have been aware of the material facts surrounding the development of the Senza Systems, including the Trade Secrets Misconduct.

167.     Additional reasons that demand on Defendant Elghandour is futile follow. Defendant Elghandour has served as a Company Director and as the Company's President and CEO since 2016. Thus, as the Company admits, Defendant Elghandour is a non-independent director. Defendant Elghandour receives handsome compensation for his service, including over $13.2 million in the year ended December 31, 2017. Defendant Elghandour also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K and the 2018 Proxy Statement, and personally made statements in the Company's earnings calls. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As the Company's highest officer and Company Director, he conducted little, if any, oversight of the Defendants' engagement in the scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Further, as a Director and the Company's President and CEO, he is responsible for the Trade Secrets Misconduct. Moreover, Defendant Elghandour is a defendant in the Securities Class Action. Thus, for these reasons, Defendant Elghandour breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168.     Additional reasons that demand on Defendant DeMane is futile follow. Defendant DeMane has served as a Company Director since 2011, and is the Company's Chairman. In addition, Defendant

DeMane was the Company's CEO and Executive Chairman from 2011 to January 2017. Thus, as the Company admits, Defendant DeMane is a non-independent director. Defendant DeMane receives handsome compensation for his service, including $329,903 in the year ended December 31, 2017. Defendant DeMane also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As Chairman of the Board, he conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant DeMane breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169.    Additional reasons that demand on Defendant Jaeger is futile follow. Defendant Jaeger has served as a Company Director since 2012, and serves as a member of the Audit Committee. Defendant Jaeger receives handsome compensation for his service, including $306,903 in the year ended December 31, 2017. Defendant Jaeger also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. His insider sales before the fraud was exposed, which yielded approximately $16.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company Director and member of the Audit Committee, he conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Jaeger

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170.    Additional reasons that demand on Defendant McCormick is futile follow. Defendant McCormick has served as a Company Director since January 2014, and is the Chair of the Audit Committee. Defendant McCormick receives handsome compensation for his service, including $304,903 in the year ended December 31, 2017. Defendant McCormick also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As a trusted Company Director and Chair of the Audit Committee, he conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant McCormick breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171.    Additional reasons that demand on Defendant Earnhardt is futile follow. Defendant Earnhardt has served as Company Director since 2015, and is a member of the Audit Committee. Defendant Earnhardt receives handsome compensation for her service, including $297,903 in the year ended December 31, 2017. Defendant Earnhardt also was the maker of many of the false statements and omissions of material fact that are alleged herein, as she signed the 2017 10-K. She also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As a long-time Company Director, she conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded her duties to monitor such controls over reporting and engagement in the

schemes, and consciously disregarded her duties to protect corporate assets. Thus, for these reasons, Defendant Earnhardt breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

172.    Additional reasons that demand on Defendant Vale is futile follow. Defendant Vale has served as a Company Director since 2015. Defendant Vale receives handsome compensation for his service, including $287,903 in the year ended December 31, 2017. Defendant Vale also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As a trusted Company Director, he conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Vale breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Behbahani is futile follow. Defendant Behbahani has served as a Company Director since 2014. Defendant Behbahani receives handsome compensation for his service, including $293,903 in the year ended December 31, 2017. Defendant Behbahani also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As a trusted Company Director, he conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Behbahani breached

his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174.   Additional reasons that demand on Defendant Fischer is futile follow. Defendant Fischer has served as a Company Director since 2012. Defendant Fischer receives handsome compensation for his service, including $291,903 in the year ended December 31, 2017. Defendant Fischer also was the maker of many of the false statements and omissions of material fact that are alleged herein, as he signed the 2017 10-K. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. As a trusted Company Director, he conducted little, if any, oversight of the Defendants' engagement in the Trade Secrets Misconduct and scheme to make false and misleading statements on behalf of the Company, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Thus, for these reasons, Defendant Fischer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.   Additional reasons that demand on the Board is futile follow.

176.   Demand in this case is excused because the Directors, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

177.   For example:

(a) Defendants Elghandour and Vale both served in senior executive positions and Johnson & Johnson Development Corporation ("JJDC"). Defendant Vale was JJDC's Vice-President, Venture Investing from 1992-2008, Head of Venture Investing from 2008 to September 2012, and Head from 2012 to 2015. Defendant Elghandour served as a Principal, Venture Investments at JJDC from 2008 to October 2012.  Upon information and belief, Defendants Elghandour and Vale developed personal and professional connections during their shared time at JJDC, especially in light of the substantial overlap between Defendant Elghandour's tenure at JJDC as a Principal, Venture Investments and Defendant Vale's tenure as Head of Venture Investing. Given Defendant Elghandour's substantial likelihood of liability in the Securities Class Action, such connections prevent Defendant Elghandour from evaluating a demand with disinterest or independence and Defendant Vale from evaluating a demand with independence.

(b) Defendants McCormick and DeMane had overlapping tenures at Medtronic Inc. ("Medtronic"). Defendant DeMane served in a number of positions at Medtronic between 2000 and 2008, Including as a VP  Spinal Systems from 2000 to 2002, as Senior VP and President: Spinal, ENT, and Surgical Navigation between 2002 and 2005, and as Chief Operating Officer from 2007 to 2008. Defendant McCormick served in various roles at Medtronic between 1992 and 2009, including as Vice President, Finance for Medtronic's, Spinal, Biologics, and Navigation business from 2002 to 2007. Upon information and belief, Defendants McCormick and DeMane developed personal and professional connections during their shared tenures at Medtronic that prevent them from evaluating a demand with independence.

Such personal and professional connections prevent the Defendants Elghandour, Vale, McCormick and DeMane from evaluating a demand with independence, especially in light of the substantial likelihood of liability faced by Defendant Elghandour in the Securities Class Action.

178.    In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act, and the Trade Secrets Misconduct. In further violation of the Code of Conduct, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, comply with laws and regulations, and properly report violations of the Code of Conduct. Further, and in violation of the Code of Conduct Defendant Jaeger engaged in insider sales of Company stock during the time the misconduct occurred. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

179. Defendants McCormick, Earnhardt and Jaeger (together, the "Audit Committee Defendants") served on the Company's Audit Committee during the time the misconduct occurred. As a result of the Audit Committee's failures to, among other things, effectively discuss with management the Company's disclosure controls and internal controls over financial reporting and compliance with legal requirements, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile. Further, as a result of the Audit Charter's requirement that the Audit Committee "discuss with the Company's general counsel, if any, or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements," the Audit Committee Defendants were either aware of the Trade Secrets Misconduct, or breached their fiduciary duties in failing to be aware of the Trade Secrets Misconduct, at the time that the false and misleading statements alleged herein were made.

180. Nevro has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Nevro any part of the damages Nevro suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

181.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

182.   The acts complained of herein constitute violations of fiduciary duties owed by Nevro's officers and directors, and these acts are incapable of ratification.

183.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Nevro. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Nevro, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

184.   If there is no directors' and officers' liability insurance, then the Directors will not cause Nevro to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

185. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of
Section 14(a) of the Securities Exchange Act of 1934**

186. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

188. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

189. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

190.     Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions, as well as increased litigation expenses; (4) due to the Trade Secrets Misconduct, the Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

191.     The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

192.     Moreover, the 2018 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct and the Company's Insider Trading Policy, due to the Individual Defendants' failures to abide by them, including by causing the Company to engage in the Trade Secrets Misconduct and Defendant Jaeger's and Galligan's insider sales.

193.     In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including, but not limited to, election of directors, approval of executive compensation, and ratification of the selection of an independent auditor.

194.     The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Vale, DeMane, and Earnhardt, which allowed them to continue breaching their fiduciary duties to Nevro.

195.     The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

196.     Plaintiff on behalf of Nevro has no adequate remedy at law.

### SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

197.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Nevro's business and affairs.

199.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

200.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Nevro.

201.     Also in breach of their fiduciary duties owed to Nevro, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company engaged in the Trade Secrets Misconduct; (2) as a result of the Trade Secrets Misconduct, the Company's Senza Systems were neither proprietary nor novel; (3) the Trade Secrets Misconduct caused the Company to be exposed to adverse regulatory and legal actions, as well as increased litigation expenses; (4) due to the Trade Secrets Misconduct, the

Company would be unable to sustain the sales growth it had been experiencing in the U.S.; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

202.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

203.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

204.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Nevro's securities.

205.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge and/or acted with reckless disregard for the truth that the Company was engaging in the fraudulent schemes set forth herein, including the Trade Secrets Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth that Defendants were causing the Company to engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially

inflating the price of Nevro's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

206.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

207.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Nevro has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

208.    Plaintiff on behalf of Nevro has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants for Unjust Enrichment**

209.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

210.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Nevro.

211.    The Individual Defendants received bonuses, stock options, or similar compensation from Nevro that was tied to the performance or artificially inflated valuation of Nevro, and/or received compensation that was unjust in light of the Individual Defendants' bad faith conduct, including, but not limited to, the Trade Secrets Misconduct.

212.    Plaintiff, as a shareholder and a representative of Nevro, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, and excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

213.   Plaintiff on behalf of Nevro has no adequate remedy at law.

### FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

214.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215.   The Individual Defendants caused the Company to waste corporate assets by engaging in the Trade Secrets Misconduct, in violation of the Company's Code of Conduct and intellectual property law.

216.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Nevro to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

217.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

218.   Plaintiff on behalf of Nevro has no adequate remedy at law.

### PRAYER FOR RELIEF

219.   FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Nevro, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Nevro;

(c)   Determining and awarding to Nevro the damages sustained by it as a result of the

violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Nevro and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Nevro and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Nevro to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Nevro restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

1

Dated:  November 3, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
/s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

DocuSign Envelope ID: A74351C3-78EA-4662-B1F0-8B2ACEAEB08E

<u>VERIFICATION</u>

I, David Nguyen am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of November 2018.

11/2/2018 1:54:21 PM PDT

David Nguyen

David Nguyen